**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

RICHARD LIGHTHALL,

                                Plaintiff,

          - v -                            Civ. No. 9:04-CV-0721
                                               (NAM/RFT)

DR. KRISHNA KUMAR VADLAMUDI, Director of Medical
Services at Marcy Correctional Facility, WILLIAM LAPE,
Superintendent of Marcy Correctional Facility, BARBARA
SCHULTZ-INMAN, Corrections Counselor at Marcy
Correctional Facility, J.E. ROWLANDS, Senior Alcohol and
Substance Abuse Counselor at Marcy Correctional Facility,
and LESTER WRIGHT, Associate Commissioner of Health
Services, New York State Department of Correctional Services,

                                Defendants.

**APPEARANCES:**                                    **OF COUNSEL:**

RICHARD LIGHTHALL
Plaintiff, *Pro Se*
02-R-5334
Marcy Correctional Facility
P.O. Box 3600
Marcy, NY 13403-3600

HON. ELIOT SPITZER                         BRUCE J. BOIVIN, ESQ.
Attorney General for the State of New York     Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

<u>**REPORT RECOMMENDATION and ORDER**</u>

     *Pro se* Plaintiff Richard Lighthall brings causes of action pursuant to 42 U.S.C. § 1983

alleging violations of the Eighth Amendment, Due Process and Equal Protection under the

Fourteenth Amendment, 42 U.S.C. § 1985, the American with Disabilities Act of 1990 ("ADA"),

42 U.S.C. § 12101, *et seq.*, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Dkt.

No. 10, Am. Compl. at ¶¶ 79, 80, 83-86, 89-90, 92-93, 95-96, 99-100, 102, 104-07, & 109-110.

Plaintiff also seeks a Preliminary Injunction to have the Defendants provide medical treatment,

to receive reasonable accommodations for his attendance at the Alcohol and Substance Abuse

Training program ("ASAT"), and to enjoin the Defendants from "withholding good time credits

and parole eligibility."  Dkt. No. 11, Prelim. Inj. Mot., Mem. of Law at pp. 7 & 16.  Dr. Krishna

Kumar Vadlamudi, Director of Medical Services at Marcy Correctional Facility, opposes the

Preliminary Injunction and brings this Cross-Motion for Summary Judgment on Plaintiff's

Eighth Amendment claims, Conspiracy claims, and ADA claims.  Dkt. Nos. 27-30.  Rather than

joining Dr. Vadlamudi in filing a Motion for Summary Judgment, William Lape, Superintendent

of Marcy Correctional Facility ("Superintendent"), Barbara Schultz-Inman, Corrections

Counselor at Marcy Correctional Facility ("Corrections Counselor"), J.E. Rowlands, Senior

Alcohol and Substance Abuse Counselor ("Senior ASA Counselor") at Marcy Correctional

Facility, and Lester Wright, Associate Commissioner of Health Services ("Associate

Commissioner") bring a Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6) and Dr.

Vadlamudi joins in Defendants' Motion to Dismiss as to all other claims.  Dkt. No. 42.  For the

reasons to follow, it is hereby recommended that the Motion for a Preliminary Injunction be

**denied**, the Motion for Summary Judgment be **granted**, the Motion to Dismiss be **granted**, and

the Amended Complaint be **dismissed** in its entirety.

## I.  FACTS

### A.  Motion to Dismiss

The following allegations contained in Lighthall's Amended Complaint are construed as

true as required by the motion to dismiss standard.[1]  Prior to Lighthall's imprisonment, Plaintiff suffered multiple injuries after falling from the roof of his home, including a back injury for which he had surgery.  Am. Compl. at ¶ 16.  In addition to his injuries, Plaintiff had two strokes which caused some paralysis on his left side as well as coordination and speech problems.  *Id.* at ¶ 17.  Plaintiff's doctor also stated that he suffers from fatigue and sleep apnea.  *Id.* at ¶ 21; Ex. A, Timothy A. Mathis, M.D., Lt., dated July 30, 2002.

A few days after his transfer to Marcy Correctional Facility ("Marcy") in early 2003,[2] Plaintiff was seen by Dr. Vadlamudi, the Director of Medical Services at the facility.  *Id.* at ¶ 30.  Plaintiff told Dr. Vadlamudi of his medical conditions, including the need for vitamin B-12 shots, his paralysis, his trouble sitting for long periods of time, his trouble going to the bathroom, his back pain, along with the possible need for an operation on his back.  *Id.* at ¶¶ 30 & 31; Mathis, M.D., Lt.

Soon after the transfer, Plaintiff was also placed into ASAT.  *Id.* at ¶ 32.  Plaintiff states that the location of ASAT was not set up for the "medically disabled."  *Id.*  Nevertheless, Plaintiff participated  in ASAT until his hospitalization,[3] during which Plaintiff was told he suffered from an enlarged heart and that he would need a catheterization.  *Id.* at ¶¶ 33 & 34.  One to two months later, Plaintiff was told he would need to see a specialist for the catheterization. As a result of Plaintiff's medical conditions, Dr. Vadlamudi removed Plaintiff from ASAT.  *Id.* at ¶ 37.

---

[1] *See infra* Part II.A.

[2] Plaintiff states that shortly after sending a letter to Lester Wright in December 2002, he was transferred to Marcy Correctional Facility.  Am. Compl. at ¶ 26; Ex. B, Lighthall Lt., dated Dec. 5, 2002.

[3] Plaintiff was taken to St. Elisabeth's Hospital in Utica.  *Id.* at ¶ 33; Ex. C, Ambulatory Health Record.

In March 2003, Plaintiff had requested vitamin B-12 shots from Dr. Vadlamudi.  *Id.* at ¶ 39.  Plaintiff also complained of "swelling of his left testicle," burning in his legs, and back pain.  *Id.* at ¶¶ 40 & 41.  Because of these complaints, Plaintiff requested to see a specialist and Dr. Vadlamudi prescribed antibiotics.  *Id.* at ¶ 41.  In July 2003, Dr. Vadlamudi placed a referral for Plaintiff to be examined by a gastroenterology specialist due to rectal pain and the enlarged testicle.  *Id.* at ¶ 42; Ex. D, Patient Referral Form & Req. and Report of Consultation.

On September 14, 2003, Plaintiff made a formal request for "reasonable accommodations" for participation in ASAT due to his disabilities.  *Id.* at ¶ 43; Ex. E, Req. for Reasonable Accommodations.  This request was denied by Dr. Vadlamudi and the Deputy Superintendent of Administration affirmed the denial.  *Id.* at ¶¶ 45 & 46; Req. for Reasonable Accommodations.  Plaintiff filed a grievance complaint, which was denied by Superintendent Lape on December 23, 2003.[4]  *Id.* at ¶¶ 47 & 48; Ex. F, Inmate Grievance Compl.  Plaintiff appealed to the Central Office Review Committee ("CORC"), and the determination was affirmed based on Associate Commissioner Wright's recommendation.  *Id.* at ¶ 48; Ex. G, Inmate Grievance Report of the Superintendent & CORC.

On September 25, 2003, Plaintiff was sent to the hospital where he received a colonoscopy for his rectal pain and problems with constipation and diarrhea.[5]  *Id.* at ¶ 50; Ex. H, Patient Referral Form & Operative/Procedure Report.  The doctor at the hospital recommended a neurological consult for Plaintiff's prior back surgery and a urological consult, which Plaintiff states were never ordered by Dr. Vadlamudi.  *Id.* at ¶¶ 50 & 51.

---

[4] The grievance also challenged his medical treatments.  *Id.* at ¶ 47.

[5] The results of the colonoscopy were normal.  *Id.* at ¶ 50; Ex. H, Patient Referral Form & Operative/Procedure Report.

On October 20, 2003, Corrections Counselor Schultz-Inman stated to Lighthall that he had been cleared to rejoin ASAT by the authorization of Dr. Vadlamudi.  *Id.* at ¶ 55; Exs. I, Schultz-Inman Lt. to Lighthall, dated Oct. 20, 2003, & J, Schultz-Inman Lt. to Dr. Vadlamudi, dated Oct. 14, 2003.  However, that same month, Plaintiff was denied "eligibility for Merit Time and Presumptive Release" for failing to complete ASAT.  *Id.* at ¶ 57; Ex. K, Merit Time Determination Notice & Presumptive Release Determination.  On November 11, 2003, Plaintiff wrote a letter to Senior ASA Counselor Rowlands requesting that he be allowed to participate in ASAT, which Plaintiff states went unanswered.  *Id.* at ¶ 58; Ex. L, Lighthall Lt. to Rowlands, dated Nov. 10, 2003.

In January 2004, Plaintiff was taken to Rome Memorial Hospital in regards to the enlarged testicle.  *Id.* at ¶ 59; Ex. M, Rome Memorial Hosp. Notes & Lab Result.  After determining there were two small cysts on the right testicle and one large cyst on the left testicle, an operation was performed to drain the cysts.  *Id.*; Rome Memorial Hosp. Notes & Lab Result.  Plaintiff then returned to Marcy and was told by Dr. Vadlamudi that "surgery [was not] necessary [for the enlarged testicle]" and that "the only medication" to be dispensed to him would be Motrin.  *Id.* at ¶ 60.

On February 23, 2004,[6] Plaintiff met with Corrections Counselor Schultz-Inman to discuss his participation in ASAT.  *Id.*  At that time Plaintiff was told that his failure to sign up for ASAT would constitute a refusal and that if it was determined that Plaintiff did not write a letter to Senior ASA Counselor Rowlands requesting participation in ASAT then that would also be marked as a refusal.  *Id.* at ¶ 61; *see* Ex. N, Inmate Assessment & Case Management Info.  In

---

[6] The Amended Complaint reflects a date of February 23, 2003, but a careful examination of Plaintiff's timeline in the Amended Complaint and attached Exhibits would make it 2004, not 2003.  *Id.* at ¶ 61; Ex. N, Inmate

March 2004, Plaintiff received a copy of Corrections Counselor Schultz-Inman's report stating that Plaintiff had refused to participate in ASAT. *Id.* at ¶¶ 62 & 63.  As a result, Plaintiff filed another grievance. *Id.* at ¶ 63; Ex. O, Inmate Grievance Compl., dated Mar. 17, 2004.  On April 5, 2004, after a hearing, the Inmate Grievance Resolution Committee ("IGRC") found Plaintiff wanted to participate and that Plaintiff should challenge the records supplied for the hearing.[7] *Id.* at ¶ 66; Ex. Q, IGRC Report.  Plaintiff appealed the decision to Superintendent Lape who affirmed the IGRC decision, which Plaintiff also appealed.  *Id.* at ¶ 67; Ex. R, Superintendent Grievance Report, dated Apr. 13, 2004 & Appeal.  The appeal to the CORC was also denied.  *Id.* at ¶ 68; Ex. S, CORC Grievance Report, dated June 2, 2004.  In June 2004, Plaintiff then wrote to Senior Counselor Mulvihill asking to have his name placed on the ASAT waiting list but was told that Senior ASA Counselor Rowlands stated Plaintiff had not reapplied to join ASAT.  *Id.* at ¶¶ 69 & 70; Ex. T, Lighthall Lt. to Mulvihill, dated June 24, 2004.

On June 28, 2004, Plaintiff had X-rays taken for his back problems.  *Id.* at ¶ 71; Ex. V, Victor Regenbogen, M.D., Lt. about MRI.  In August 2004, Plaintiff was suspended from "all programs, recreation and work" due to his medical conditions which remained in effect until February 2, 2005.  *Id.* at ¶ 72; Ex. W, Inmate Medical Excuse.

---

Assessment & Case Management Info.

[7] Plaintiff states that Corrections Counselor Schultz-Inman "perjured" herself by submitting documents that said Senior ASA Counselor Rowlands had contacted "Medical" to determine whether Plaintiff could join ASAT, that Rowlands had answered Plaintiff's letter, and that Dr. Vadlamudi had cleared Plaintiff to participate in ASAT.  *Id.* at ¶ 65; Ex. P, Marcy Mem.

**B.  Motion for Summary Judgment**

Pursuant to the summary judgment standard,[8] the following additional facts present no genuine issues of material fact.[9]  Upon Plaintiff's transfer to Marcy on January 29, 2003, Plaintiff was seen by Dr. Vadlamudi but no reference was made in the health records as to Plaintiff's need for B-12 injections until Plaintiff requested B-12 injections on February 12, 2003, to someone other than Dr. Vadlamudi.  Dkt. No. 30, Dr. Krishna Kumar Vadlamudi Aff., Ex. A at pp. 84-86.[10]  Plaintiff was examined by Dr. Vadlamudi on March 4, 2003, whereby Plaintiff made reference to his B-12 vitamin level.  *Id.* at p. 82.  Plaintiff's B-12 level was subsequently tested on March 11, 2003, and the results, which were returned on March 13, 2003, indicated that the level was within the normal range.  Dkt. No. 28, Dr. Krishna Kumar Vadlamudi's Stat. of Material Facts at ¶ 2; Dr. Vadlamudi Aff., Ex. A at p. 107.  Despite one hundred and fourteen (114) Ambulatory Health Records entries dealing with Plaintiff's numerous complaints since March 13, 2003, it was not until October 26, 2004, that the health records showed that the B-12 issue was raised and addressed once again.  *See* Dr. Vadlamudi Aff., Ex. A at pp. 17-80.  In November 2004, around the time Plaintiff received his catheterization, Plaintiff was retested for his vitamin B-12 level.  Dr. Vadlamudi's Stat. of Material Facts at ¶¶ 3 & 4; Dr. Vadlamudi Aff., Ex. A at pp. 277-78; Dkt. No. 33, Pl.'s Stat. of Material Facts at ¶ 7.  When it was found that his level fell slightly below the normal range, on

---

[8] *See infra* Part II.B.

[9] *See* N.D.N.Y.L.R. 7.1(a)(3).

[10] The exhibits include documents of records of medical consultations, diagnoses, treatments, ambulatory health records as well as related documents.

November 11, 2004, Dr. Vadlamudi began giving Plaintiff vitamin B-12 injections, which he

prescribed to be given to Plaintiff for six months.  Dr. Vadlamudi's Stat. of Material Facts at ¶¶ 3

& 4; Dr. Vadlamudi Aff., Ex. A at p. 277-78; Pl.'s Stat. of Material Facts at ¶ 7.

 Prior to Plaintiff's complaints made to Dr. Vadlamudi involving any rectal pain, testing

had been conducted on February 18, 2003, regarding some complaints by Plaintiff to the medical

staff on rectal problems, where it was found that cultures were negative.  Dr. Vadlamudi Aff.,

Ex. A at p. 108.  On March 14, 2003, Plaintiff made his first complaint about rectal pain.  *Id.* at

p. 80.  After several more complaints were made, Plaintiff was again tested on May 9, 2003,

where the culture came back negative.  *Id.* at pp. 72-80 & 106.  After two more complaints on

May 11th and 14th, another test was performed on May 20th with the same result as previous tests.

*Id.* at pp. 104-105.

 On June 19, 2003, Dr. Vadlamudi requested that Plaintiff receive a colonoscopy, which

was scheduled for and performed on September 25, 2003.  *Id.* at pp. 169 & 171. On October 10,

2003,  the surgeon who performed the procedure recommended Plaintiff receive a neurological

consult for his 1998 back surgery, a urological consult for his prostate and bladder dysfunction,

and Flomax twice a day.  *Id.* at pp. 169-70 & 171-72.  On September 30, 2003, a urological

consult was ordered and the consultation occurred on December 12, 2003, where it was found

that Plaintiff had an enlarged testicle and that medications should be prescribed along with a

follow up visit in two months.  Pl.'s Stat. of Material Facts at ¶¶ 21, 22, & 23; Dr. Vadlamudi's

Stat. of Material Facts at ¶ 7; Dr. Vadlamudi Aff., Ex. A at pp. 51, 157, & 168.  Follow up tests

were conducted and another appointment was scheduled for February 13, 2004.  Pl.'s Stat. of

Material Facts at ¶¶ 27, 28, 30, & 31; Dr. Vadlamudi Aff, Ex. A at pp. 51, 100-01, 120, 140, &

156.

However, on January 23, 2004, an ultrasound was performed where it was discovered that Plaintiff had cysts on his testicles, for which medication was prescribed.  Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Pl.'s Stat. of Material Facts at ¶¶ 24, 25, & 26; Dr. Vadlamudi Aff., Ex. A at pp. 46 & 121-23.  In February 2004, Plaintiff was again seen by the urologist who prescribed antibiotics and recommended monitoring Lighthall's condition with a notation that surgery could be necessary to drain the cysts.   Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Pl.'s Stat. of Material Facts at ¶ 27; Dr. Vadlamudi Aff, Ex. A at p. 140.  Plaintiff was also seen by the urologist in May, July, and November of 2004 and although Plaintiff returned to the urological specialist several times and medication was prescribed each time, the urologist had not, as of December 1, 2004, recommended surgery for his testicle problem.  Pl.'s Stat. of Material Facts at ¶¶ 28, 29, 30, & 31; Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Dr. Vadlamudi Aff. at pp. 97, 98-99, 161, 162, & 282.  During the period of Plaintiff's complaints from March 2003 till October 2004 about his testicular pain, Plaintiff not only received consultations but was also prescribed many medications in an attempt to alleviate his pain.  Dr. Vadlamudi Aff., Ex. A at pp. 25, 27, 42, 44, 45, 50, 57, 58, 73, & 74.

When Plaintiff was examined upon his entry into Marcy, it was noted that Plaintiff had a heart condition for which he received medications.  Dr. Vadlamudi Aff., Ex. A at p. 86.  On March 3, 4, and 18, 2003, Plaintiff complained about chest pains.  *Id.* at pp. 77 & 82-83.  At those times and because of the complaints, Lighthall was prescribed medication and was told to come back to see Dr. Vadlamudi if he had pains again.  *Id.*  However, during the March 4th examination, Plaintiff noted he did not have any chest pains at that time but that he had actually felt chest pains the previous night.  *Id.* at p. 82.  On March 23, 2003, Plaintiff complained of chest pains and was taken to St. Luke's Hospital.  Pl.'s Stat. of Material Facts at ¶ 40; Dr.

Vadlamudi Aff., Ex. A at p. 76.  Several tests were performed and it was determined that

Plaintiff had an enlarged heart with blockage and that he would need a catheterization.  Pl.'s

Stat. of Material Facts at ¶ 41.  After Lighthall returned from the hospital, Plaintiff made several

complaints regarding some pain, but no direct reference to chest pain was made again until

December 9, 2003.  Pl.'s Stat. of Material Facts at ¶ 42; Dr. Vadlamudi Aff., Ex. A at pp. 19-51,

52, & 53-76.

On June 23, 2003, Plaintiff was seen by a cardiologist who recommended several

medications and that Plaintiff stop smoking.  Dr. Vadlamudi Aff., Ex. A at pp. 64 & 180.  On

December 1, 2003, Plaintiff was again seen by a heart specialist who recommended certain

medications and a catheterization.  Dr. Vadlamudi Aff., Ex. A at p. 166; Pl.'s Stat. of Material

Facts at ¶ 44.  On December 18, 2003, Plaintiff refused to have the catheterization performed

until he was seen by the heart specialist.  Pl.'s Stat. of Material Facts at ¶ 45; Dr. Vadlamudi

Aff., Ex. A at p. 165.  Besides having chest pain, Plaintiff also complained of rectal and back

pain.  On October 25, 2004, in conjunction with the possibility of surgery on his back,

cardiology clearance was needed and it was at this time when Plaintiff was willing to have the

catheterization performed.  Dr. Vadlamudi Aff., Ex. A at p. 264.  On October 26, 2004, a request

was made to schedule the catheterization.  *Id.* at pp. 17 & 263.  On November 10, 2004, Plaintiff

received a consultation with the heart specialist who performed a catheterization.  Pl.'s Stat. of

Material Facts at ¶ 47; Dr. Vadlamudi's Stat. of Material Facts at ¶ 6; Dr. Vadlamudi Aff., Ex. A

at pp. 280-281.  Prior to the catheterization, Plaintiff has been treated for his heart ailments by

receiving blood pressure and cholesterol medications, stress tests, and referrals to a cardiologist.

 Dr. Vadlamudi's Stat. of Material Facts at ¶ 6; *see generally* Dr. Vadlamudi Aff., Ex. A at pp.

17-282.  Since the catheterization, the cardiologist recommended Plaintiff take certain

10

medications and follow up with Dr. Vadlamudi.  Dr. Vadlamudi Aff., Ex. A at p. 280.

With regard to Plaintiff's back pain, on April 22, 2003, Plaintiff was prescribed medication and a recommendation was made for an X-ray.  Dr. Vadlamudi Aff., Ex. A at p. 73.  On April 24, 2003, it was determined that he had some mild back problems.  *Id.* at p. 126.  Plaintiff then made specific complaints about his back pain on September 30, 2003, November 25, 2003, March 12 and 22, 2004, May 1, 2004, and then again on June 3, 2004.  Dr. Vadlamudi Aff., Ex. A at pp. 38, 41, 42, 43, 44, 53, & 59.  During this period, Plaintiff received numerous medications for the back pain.  *Id.*  On June 8, 2004, Dr. Vadlamudi requested an MRI for Lighthall, which was conducted on June 28, 2004.  *Id.* at p. 158.  The MRI revealed "bulging of discs at L5-S1, L4-5 and L3-4."  Pl.'s Stat. of Material Facts at ¶ 56; Dr. Vadlamudi Aff., Ex. A at pp. 124-25.  A neurosurgery consult was requested on July 7 and August 11, 2004, and was eventually scheduled on September 15, 2004.  Dr. Vadlamudi Aff, Ex. A at pp. 159 & 269.  The neurologist recommended a CT scan and referral to a cardiologist for clearance of the back surgery.  *Id.* at pp. 269-72.  On September 30, 2004, Dr. Vadlamudi requested a follow up visit and approval for the CT scan.  *Id.* at p. 136.  The CT scan was performed on October 1, 2004.  *Id.* at pp. 118-19.  After clearance was given by the cardiologist, Plaintiff was scheduled for surgery in March 2005.  Dr. Vadlamudi's Stat. of Material Facts at ¶ 5.

As a facility physician, Dr. Vadlamudi notes that he has no role in deciding parole eligibility or the dispensation of good time credits, which Plaintiff admits.  Dr. Vadlamudi's Stat. of Material Facts at ¶ 8; Pl.'s Stat. of Material Facts at ¶ 8.  Moreover, Dr. Vadlamudi does not have the authority to "approve or disapprove requests for reasonable accommodations" as he can

only provide medical recommendations regarding the requests.[11]  Dr. Vadlamudi's Stat. of

Material Facts at ¶ 9; Pl.'s Stat. of Material Facts at ¶ 63.   However, Plaintiff sought many

medical excuses to be excused from participation in ASAT.  Dr Vadlamudi Aff., Ex. A at pp. 34,

36, 37, 59, & 76.  Furthermore, Dr. Vadlamudi gave Plaintiff medical restrictions that would

have allowed him to participate in ASAT.[12]  Dr. Vadlamudi's Stat. of Material Facts at ¶ 10;

Pl.'s Stat. of Material Facts at ¶ 71.  Dr. Vadlamudi also notes that he never spoke to Associate

Commissioner Wright about Plaintiff's medical condition.  Dr. Vadlamudi's Stat. of Material

Facts at ¶ 11.

## II.  DISCUSSION

### A.  Motion to Dismiss Standard

Upon a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), a court may dismiss a

complaint "only if 'it appears beyond a doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief.'"  *Equal Employment Opportunity*

*Comm'n v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000) (quoting *Conley v. Gibson*,

355 U.S. 41, 45-46 (1957) & citing *Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 171 (2d Cir.

1998)); *see also Green v. New York State Dep't of Corr. Serv. et al*, 2003 WL 22169779, at *1

(N.D.N.Y. Aug. 27, 2003).  Furthermore, "the court must accept as true the factual allegations in

the complaint, and draw all reasonable inferences in favor of the plaintiff."  *Harris v. City of*

*New York*, 186 F.3d 243, 247 (2d Cir. 1999); *see also Smith v. Local 819 I.B.T. Pension Plan*,

---

[11] Furthermore, in regards to Plaintiff's grievance filed based on accommodations in September 2003, the reason for the denial was that Lighthall could "receive a medial excuse for a specific medical need if medically warranted."  Pl.'s Aff., Ex. at p. A-31.

[12] Plaintiff only argues that Dr. Vadlamudi did not specify the medical restrictions, not that Dr. Vadlamudi refused to allow Plaintiff to participate in ASAT.  Pl.'s Stat. of Material Facts at ¶¶ 70 & 71.

291 F.3d 236, 240 (2d Cir. 2002) (citations omitted).  Additionally, "[i]n assessing the legal

sufficiency of a claim [under 12(b)(6)], the court may consider those facts alleged in the

complaint, documents attached as an exhibit thereto or incorporated by reference . . . and

documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference."

 *Green*, 2003 WL 22169779, at *1 (internal quotation marks and citations omitted) (alterations in

original).

Moreover, pleadings submitted by *pro se* litigants "should be 'construed liberally,'" and a

complaint "should not be dismissed unless 'it is clear that the plaintiff would not be entitled to

relief under any set of facts that could be proved consistent with the allegations.'"  *Phillips v.

Girdich*, 408 F.3d 124, 127 (2d Cir. 2005) (internal citations omitted).  A "dismissal on the

pleadings is *never* warranted unless the plaintiff's allegations are doomed to fail under any

available legal theory."  *Id.* at 128.

### B.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is

no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a

matter of law."  The moving party bears the burden to demonstrate through "pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,"

that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.

1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for

summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil

Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the

material facts as to which it contends there exist no genuine issues to be tried, those facts will be

deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica*

*Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## C. Eleventh Amendment

Plaintiff brings suit against Defendants Vadlamudi, Lape, Schultz-Inman, Rowlands, and

14

Wright in both their individual and official capacities.  Am. Compl. at ¶¶ 3-7.  Plaintiff seeks a declaratory judgment, injunctive relief, as well as compensatory and punitive damages against these individuals in their individual and official capacities.  *Id.* at § VII (a), (b), (d), & (e).

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity.  *Huang v. Johnson*, 251 F.3d 65, 69 (2d Cir. 2000).  The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "'real, substantial party in interest.'"  *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.*, 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984)).  Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities."  *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages.  However, Lighthall may seek damages from them in their individual capacities.  Furthermore, Plaintiff may sue the Defendants for declaratory and injunctive relief in both their individual and official capacities because "'official-capacity actions for prospective relief are not treated as actions against the State.'"  *Cruz v. Gomez*, 202 F.3d 593, 595 n.2 (2d Cir. 2000) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)).

### D.  Eighth Amendment Cruel and Unusual Punishment Claim

Lighthall claims that Dr. Vadlamudi violated his Eighth Amendment rights by acting

with deliberate indifference to his medical needs when Dr. Vadlamudi did not adequately treat

Plaintiff's conditions, delayed treatment, failed to follow another doctor's recommendations, and

provided medications that were ineffective.  Am. Compl. at ¶¶ 83, 92, & 93.  Plaintiff states that

Dr. Vadlamudi declined to take additional measures to "improve his deteriorating serious

medical conditions."  *Id.* at ¶ 93.  Additionally, Plaintiff claims that Associate Commissioner

Wright was deliberately indifferent by failing to "train and supervise health services employees

under his authority."  *Id.* at ¶¶ 79 & 80.  Plaintiff also states that Associate Commissioner Wright

implemented policies that allowed for denial of Plaintiff's grievances, thus aiding in Dr.

Vadlamudi's Eighth Amendment violations.  *Id.* at ¶ 86.  Plaintiff further alleges that

Superintendent Lape was deliberately indifferent to his medical needs when Lape affirmed Dr.

Vadlamudi's determination and the denial of Plaintiff's grievances.  *Id.* at ¶ 84 & 102.

     The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment.

Prohibited punishment includes that which "'involve[s] the unnecessary and wanton infliction of

pain.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gregg v. Georgia*, 428

U.S. 153, 173 (1976)).  "In order to establish an Eighth Amendment claim arising out of

inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical

needs."  *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotation marks and

citations omitted) (alteration in original).  This standard contains objective and subjective

elements.  *Id.*  "The objective 'medical need' element measures the severity of the alleged

deprivation, while the subjective 'deliberative indifference' element ensures that the defendant

prison official acted with a sufficiently culpable state of mind."  *Id.* at 183-84 (citing *Chance*,

143 F.3d at 702 & *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).  The subjective

element "'entails something more than mere negligence . . . [but] something less than acts or

16

omissions for the very purpose of causing harm or with knowledge that harm will result.'"
*Hathaway v. Coughlin*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)).

This deliberate indifference must be in regards to the "prisoner's serious illness or
injury[.]"  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  Additionally, "'[b]ecause society does
not expect that prisoners will have unqualified access to health care,' a prisoner must first make
this threshold showing of serious illness or injury in order to state an Eighth Amendment claim
for denial of medical care."  *Smith*, 316 F.3d at 184 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9
(1992)) (further citation omitted).  Some factors that determine whether a prisoner's medical
condition is serious include: "1) whether a reasonable doctor or patient would perceive the
medical need in question as important and worthy of comment or treatment, 2) whether the
medical condition significantly affects daily activities, and 3) the existence of chronic and
substantial pain."  *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (internal quotation
marks and citations omitted) (noting that an inmate is not required to show "that he or she
experiences pain that is the limit of human ability to bear, nor [does the court] require a showing
that his or her condition will degenerate into a life threatening one").

The prisoner has to show "more than an inadvertent failure to provide adequate medical
care by prison officials to successfully establish Eighth Amendment liability."  *Smith*, 316 F.3d
at 184 (internal quotation marks and citation omitted).  Prison officials act with deliberate
indifference "when [they] 'know[] of and disregard[] an excessive risk to inmate health or safety;
the official[s] must both be aware of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and [they] must also draw the inference.'"  *Chance*, 143
F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. at 837).  The Eighth Amendment deals with
"the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather

17

than the severity of the prisoner's underlying medical condition, considered in the abstract[.]"
*Smith*, 316 F.3d at 186 (citations omitted).  Moreover, the "severity of the alleged denial of
medical care should be analyzed with regard to all relevant facts and circumstances."  *Id.* at 187
(citation omitted).

A prisoner's disagreement with the form of treatment proscribed by medical personnel
will not necessary implicate the Eighth Amendment.  *Ifill v. Goord*, 2004 WL 1663994, at *3
(W.D.N.Y. Apr. 8, 2004) (citation omitted).  Furthermore,

> disagreements between a prisoner and prison officials over treatment decisions fall
> short of cruel and unusual punishment.  Thus, disagreements over medications,
> diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for
> specialists or the timing of their intervention, are not adequate grounds for a section
> 1983 claim.  These issues implicate medical judgments and, at worst, negligence
> amounting to medical malpractice, but not the Eighth Amendment.

*Id.* (quoting *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y.
2001)).

Notably, when a prisoner, in essence, claims medical malpractice,

> a complaint that a physician has been negligent in diagnosing or treating a medical
> condition does not state a valid claim of medical mistreatment under the Eighth
> Amendment.  Medical malpractice does not become a constitutional violation merely
> because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must
> allege acts or omission sufficiently harmful to evidence deliberate indifference to
> serious medical needs.

*Hathaway v. Coughlin*, 99 F.3d at 553 (quoting *Estelle*, 429 U.S. at 106 & n.14).

If the malpractice involved "culpable recklessness, i.e., an act or failure to act by the prison
doctor that evinces 'a conscious disregard of a substantial risk of harm,'" then it may constitute
deliberate indifference.  *Id.* (quoting *Farmer*, 511 U.S. at 839).  Additionally, "[p]rison officials
and medical personnel have wide discretion in treating prisoners, and Section 1983 is not
designed to permit federal courts to interfere in the ordinary medical practices of state prisons."
*Ifill v. Goord*, 2004 WL 1663994, at *3 (internal quotation marks and citation omitted).

18

Because every doctor does not treat an illness in the same way, the mere difference in treatment by a defendant physician does not amount to culpability.  *McKenna v. Wright*, 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002) (citing *Douglas v. Stanwick*, 93 F. Supp. 2d 320, 325 (N.D.N.Y. 2000)).  There will be no Eighth Amendment claim then "'when a *doctor* disagrees with the professional judgment of another doctor.'"  *Id.* (quoting *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) (emphasis in original)); *see also Webb v. Jackson*, 1994 WL 86390, at *3 (S.D.N.Y.), *aff'd* 47 F.3d 1158 (2d Cir. 1995) (stating that "mere differences in opinion, whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation of inadequate medical treatment pursuant to section 1983" (citation omitted)).

Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment.  The "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Thomas v. Nassau County Corr. Ctr.*,  288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) (quoting *Chance,* 143 F.3d at 703).  Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years." *Freeman v. Stack*, 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000) (internal quotation marks omitted).

Moreover, if a plaintiff seeks to bring a § 1983 action for supervisory liability, there needs to be a showing of personal involvement by the supervisor.  *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).  "'Absent some personal involvement by [the supervisory official] in

the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983." *Id.*
at 144-45 (quoting *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987)) (alterations in original).
However, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the
> constitutional violation, 2) failure to remedy a wrong after being informed through a
> report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting
> to a constitutional violation, or allowing such a policy or custom to continue, 4)
> grossly negligent supervision of subordinates who committed a violation, or 5)
> failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)) (further citations omitted).

In this case, it must first be determined whether Lighthall's illnesses and injuries are
serious.  It has been well documented that Lighthall at least suffered from back, chest, and
testicular pain as well as conditions resulting from his stroke.  *See* Am. Compl. at ¶¶ 16, 17, 30,
33, 42, 50, 59, & 71; *see also* Dr. Vadlamudi's Aff., Ex. A at pp. 1-282.  None of the Defendants
dispute whether Lighthall's illnesses or injuries were serious.  Dkt. No. 29, Dr. Vadlamudi's
Mem. of Law in Opp'n to Prelim. Inj. and for Mot. for Summ. J. at pp. 13-18; Dkt. No. 42, Mot.
to Dismiss, Mem. of Law at pp. 15-16.  In fact, Defendants fail to address the issue of serious
illness or injuries.[13]  Dr. Vadlamudi's Mem. of Law in Opp'n to Prelim. Inj. and for Mot. for
Summ. J. at pp. 13-18.  Therefore, it will be assumed that Lighthall can withstand the first prong
of the analysis.

Next, Lighthall must show deliberate indifference on the part of Dr. Vadlamudi.  Plaintiff
must show that Dr. Vadlamudi disregarded excessive risk to his health or safety.  Lighthall must
also show that Dr. Vadlamudi committed something more than mere negligence.  Here, Plaintiff
claims that Dr. Vadlamudi failed to treat his illnesses and injuries by "disregarding" the

---

[13] The Court acknowledges that Plaintiff's heart and back problems from the record provided could be
serious illnesses; furthermore, the cumulative effect of Plaintiff's illnesses and injuries, including the chest, back,

recommendations of other doctors and specialists.  Am. Compl. at ¶ 92.  Lighthall also claims that despite receiving medications and treatment from Dr. Vadlamudi, they were ineffective and Dr. Vadlamudi did nothing further to alleviate his pain.  *Id.* at ¶ 93.

Here, there were over a hundred Ambulatory Health Records entries dealing with Lighthall's medical complaints and the treatment provided or course of action to be taken.  *See* Dkt. No. 33, Pl.'s Aff., Ex. at pp. A1 & A47; *see generally* Dr. Vadlamudi's Aff., Ex. A at pp. 17-282.  Plaintiff also had several lab analyses performed for his various conditions.  *See generally* Dr. Vadlamudi's Aff., Ex. A at pp. 1-282.  In addition, there were numerous requests and reports for consultations provided by Dr. Vadlamudi.  Pl.'s Aff., Ex. at pp. A16, A19, A20-21, A24, & A26-27; Dr. Vadlamudi's Aff., Ex. A at pp. 26-28, 32, 52-53, 61, 74, 118, 121-24, 128-31, 133, 136-41, 145-51, 153-59, 161-62, 166-68, 171-73, 177-80, 182-83, 185-90, 192, 197, 199-200, 237, 262-65, 267-69, & 274-76.  Plaintiff also received several hospital stays and emergency room visits for his ailments including chest and testicular pain.  Pl.'s Aff., Ex. at p. A15; Dr. Vadlamudi's Aff., Ex. A at pp. 90, 93, 195, & 203-06.  Moreover, Plaintiff received medications and treatment, some pursuant to recommendations by other doctors.  Pl.'s Aff., Ex. at pp. A22, A28, & A42-43; Dr. Vadlamudi's Aff., Ex. A at pp. 29, 39-40, 44-46, 50, 54, 58, 63-65, 68, 71, 73, 84, 88, 91, 169-70, 223, & 249.

A thorough review of the record does not indicate that Dr. Vadlamudi provided a course of treatment that was different from any of those recommended by the specialists.  *See generally* Dr. Vadlamudi Aff., Ex. A at pp. 17-282.  When tests revealed that Plaintiff's B-12 level was

---

and testicular pain would constitute serious conditions.

low, Dr. Vadlamudi ordered six months of injections.  Dr. Vadlamudi Aff., Ex. A at pp. 277-78.

Plaintiff's testicular pain was dealt with in numerous ways including testing, prescribing

medications, requesting further consultations and providing a colonoscopy and ultrasound.  Dr.

Vadlamudi Aff., Ex. A at pp. 46, 51, 72-80, 97, 98-99, 100-01, 104-105, 106, 108, 120, 121-23,

140, 156, 157, 161, 162-168, 169, 171-72, & 282; *see supra* Part I.B.  When Plaintiff complained

about his chest pain, Dr. Vadlamudi provided medications for the pain and sent Plaintiff to the

hospital for tests.  Dr. Vadlamudi Aff., Ex. A at pp. 76, 77, 82-83, & 86; *see supra* Part I.B.

Plaintiff was then seen by a cardiologist several times; he received medications that were

recommended, and a catheterization was performed once Plaintiff had consented.  Dr.

Vadlamudi Aff., Ex. A at pp. 64, 165, 166, 180, 264, 280-81; Dr. Vadlamudi's Stat. of Material

Facts at ¶ 6; *see supra* Part I.B.  In regards to Plaintiff's back pain, he received medications, an

X-ray, an MRI, and a CT scan along with neurological consults and surgery was slated for

March 2005.  Dr. Vadlamudi Aff., Ex. A at pp. 38, 41-44, 53, 59, 73, 118-19, 124-25, 126, 136,

158, 159, & 269-72; Dr. Vadlamudi's Stat. of Material Facts at ¶ 5; *see supra* Part I.B.  The

Court notes that differing opinions in the form of treatment will not necessarily implicate the

Eighth Amendment.  *See Ifill*, 2004 WL 1663994, at *3; *Webb*, 1994 WL 86390, at *3.  This

includes disagreements over medications and forms of treatment.  *See Ifill*, 2004 WL 1663994, at

*3.  Here, only Plaintiff disagrees with the treatment he received.  The specialists and Dr.

Vadlamudi did not have differing opinions as to the course of treatment that should take place

for Plaintiff.  The ambulatory health records, reported extensively above, verifies that there was

no disagreement between the medical professionals on how to treat and manage Plaintiff's

multitude of medical infirmaries, and furthermore, clearly confirms that Dr. Vadlamudi followed

the advice and directions provided by the medical consultants.  *See supra* Parts I.A. & B.  In any

case, Dr. Vadlamudi would not be required to follow the recommendations of other doctors since doctors treat ailments differently.  Plaintiff has not shown that Dr. Vadlamudi was deliberately indifferent to his medical needs and that Dr. Vadlamudi knew of and disregarded any risks to Plaintiff's health, his disagreement notwithstanding.

In addition, Plaintiff claims substantial delays in the treatment of his numerous ailments. However, delay in and of itself will not necessarily implicate the Eighth Amendment unless "it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'"  *Thomas*, 288 F. Supp. 2d at 339 (citing *Chance*, 143 F.3d at 703).  That is not the case here.  Plaintiff's Ambulatory Health entries reflect, beginning in January 2003 and up till October 26, 2004, that there were over one hundred entries dealing with Plaintiff's chest, back, and testicular pain along with other ailments involving his stomach.  Dr. Vadlamudi Aff., Ex. A at pp. 17-86.  Presumably, the only ostensible delay was that of the B-12 vitamin injections. However, Plaintiff had been tested with results in the normal range in March 2003 and it was not until he was tested for his heart problems when it was revealed that the levels were only slightly below the normal range; injections were immediately ordered.  There was no conscious disregard of risk to Plaintiff.  In the mean time, Plaintiff was treated for all his other ailments.  Some delays in receiving consultations naturally occurred since they had to be approved ostensibly by either the administration or consultant.  Once approved, however, appointments and even follow-up visits were scheduled.  *See supra* Part I.B.  For example, a urological consult was ordered a few days after Plaintiff's colonoscopy and Plaintiff received the consult about two months after the request was placed.  Dr. Vadlamudi Aff., Ex. A at pp. 51, 157, & 168.  There were no appreciable gaps in the treatment of Plaintiff and Plaintiff has failed to show that Dr. Vadlamudi evinced a conscious disregard of a substantial risk of serious harm.  All of Plaintiff's arguments

23

with regard to the Eighth Amendment could connote at best negligence on the part of Dr. Vadlamudi possibly amounting to medical malpractice, but it does not implicate the Eighth Amendment.  Therefore, Plaintiff has failed to show that Dr. Vadlamudi violated his Eighth Amendment rights.

Additionally, Plaintiff asserts that Associate Commissioner Wright and Superintendent Lape were deliberately indifferent to his serious medical needs.

Lighthall has stated that Associate Commissioner Wright did not properly train and supervise his health employees.  Am. Compl. at ¶ 79.  Plaintiff also alleges that Wright implemented health policies that in turn aided in Dr. Vadlamudi's deliberate indifference.  *Id.* at ¶ 86.  Plaintiff does not allege that Wright had actual and direct participation in the constitutional violation in either case.  Therefore, with regard to employee training and supervision, it must be shown that Wright was grossly negligent in the supervision of employees who committed a constitutional violation.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (citation omitted); *Hernandez v. Keane*, 341 F.3d at 145 (quoting *Colon v. Coughlin*, 58 F.3d at 873); *see also Brock v. Wright*, 315 F.3d at 165.  As to the health policies, Wright could be held liable if Lighthall could prove that "a jury could reasonable find that [Wright] 'created a policy or custom under which unconstitutional practices occurred or [that Wright] allowed the continuance of such a policy or custom.'"  *Brock*, 315 F.3d at 165 (quoting *Colon*, 58 F.3d at 873).

Plaintiff has failed to plead facts that Wright was grossly negligent in any fashion in the training or supervision of his health employees who may have committed a constitutional violation.  Furthermore, according to Lighthall, his sole complaint is that the health policy gives Dr. Vadlamudi "sole discretion as to what treatments Plaintiff would receive, regardless of the recommendations of specialists[.]"  Am. Compl. at ¶ 86.  This is akin to the argument of

differing medical opinions as stated previously.  *See supra* at pp. 18-19.  As previously stated, no

Eighth Amendment constitutional violation was found to have occurred by Dr. Vadlamudi.

Because Associate Commissioner Wright's Motion to Dismiss on this issue is derivative of Dr.

Vadlamudi's Motion for Summary Judgment regarding violations of the Eighth Amendment, and

since no unconstitutional practices occurred, no supervisory liability exists against Defendant

Wright on any basis.

 In regards to Superintendent Lape, Plaintiff states that the denial of his appeals which

were affirmed by Lape and the failure to act upon the grievance constituted deliberate

indifference in violation of Plaintiff's rights.  Am. Compl. at ¶¶ 84 & 102.  As noted above, Dr.

Vadlamudi was not deliberately indifferent to Lighthall's medical needs in violation of the

Eighth Amendment.  Since no constitutional violation occurred and there was no wrong to

remedy, no supervisory liability exists as to Defendant Lape.

For the reasons stated above, it is hereby recommended that the Motion for Summary

Judgment be **granted**, and the Motion to Dismiss be **granted** on the issue of deliberate

indifference to Lighthall's medical needs in violation of the Eighth Amendment.

### E.  Fourteenth Amendment

Plaintiff alleges that Corrections Counselor Schultz-Inman, Superintendent Lape, and

Senior ASA Counselor Rowlands violated his due process rights by conspiring to deny Lighthall

"the right to consideration for discretionary release from prison" when documents were forged

and false information was placed in his file.  Am. Compl. at ¶ 104.  In addition, Plaintiff claims

that Superintendent Lape denied his due process rights by depriving him of "Merit Time

Eligibility" pursuant to N.Y. CORRECT. LAW § 803 when Lape "affirm[ed] grievances" filed by

Lighthall.  *Id.* at ¶ 84.  Furthermore, Plaintiff claims that Defendants Schultz-Inman and

Rowlands violated his due process rights by conspiring to forge documents and give false information to deny Lighthall "Merit Time." *Id.* at ¶ 85. Plaintiff asserts this was done with the intent to deny him "Good Time Eligibility" and "discretionary release to Parole Supervision." *Id.* Plaintiff claims that his Due Process claim arises out of a protected liberty interest in "discretionary release consideration" and his "disqualification" from ASAT due to his disabilities. *Id.* at ¶ 106.

The Due Process Clause of the Fourteenth Amendment states that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. It is well-established that a prisoner who has been lawfully incarcerated will only have "a narrow range of protected liberty interests." *Morris v. Dann*, 1996 WL 732559, at *3 (N.D.N.Y. Dec. 11, 1996). The Supreme Court has stated that "the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Benjamin v. Fraser*, 264 F.3d 175, 189 (2d Cir. 2001). Therefore, in order to succeed on a § 1983 claim based on the Fourteenth Amendment, the prisoner would have to prove "a deprivation of a liberty interest protected by the Due Process Clause itself, or a violation of a state-created liberty interest." *Morris*, 1996 WL 732559, at *3.

It is well-settled that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal and Corr. Complex*, 442 U.S. 1, 7 (1979); *see also Leevon v. Goord*, 2003 WL 22384787, at *7 (W.D.N.Y. Sept. 4, 2003). And, for a prisoner to survive a motion to dismiss on a Due Process claim, the prisoner must allege that: 1) "the State has granted inmates, by

regulation or statute, a protected liberty interest with respect to the terms or conditions of confinement; and 2) the defendants' action creates an 'atypical and significant hardship' with regard to those terms or conditions of confinement." *Shariff v. Artuz*, 2000 WL 1219381, at *6 (S.D.N.Y. Aug. 28, 2000) (citing *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996) & quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

     Here, the state has not created a protected liberty interest in "Merit Time" or participation in a program that has implications on good time credit. The law states that the prisoner does not have the right to demand or require the state officials to provide "Merit Time." New York's Correction Law [hereinafter N.Y. CORRECT. LAW] sets forth the standards for good behavior allowances against indeterminate and determinate sentences and states "[n]o person shall have the right to demand or require the allowances authorized by this section. The decision of the commissioner of correctional services as to the granting, withholding, forfeiture, cancellation or restoration of such allowances shall be final and shall not be reviewable if made in accordance with law."[14] N.Y. CORRECT. LAW § 803(4). N.Y. CORRECT. LAW § 803(3) gives the

---

[14] N.Y. CORRECT. LAW § 803 states in pertinent part:

1. (a) Every person confined in an institution of the department or a facility in the department of mental hygiene serving an indeterminate or determinate sentence of imprisonment, except a person serving a sentence with a maximum term of life imprisonment, may receive time allowance against the term or maximum term of his sentence imposed by the court. Such allowances may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and may be withheld, forfeited or canceled in whole or in part for bad behavior, violation of institutional rules or failure to perform properly in the duties or program assigned.

           * * *

(d) (i) Except as provided in subparagraph (ii) of this paragraph, every person under the custody of the department or confined in a facility in the department of mental hygiene serving an indeterminate sentence of imprisonment with a minimum period of one year or more or a determinate sentence of imprisonment of one year or more imposed pursuant to section 70.70 or 70.71 of the penal law, may earn a merit time allowance.

           * * *

3. The commissioner of correctional services shall promulgate rules and regulations for the granting, withholding, forfeiture, cancellation and restoration of allowances authorized by this section in

Commissioner of Correctional Services the discretion to decide whether a prisoner is to receive "Merit Time."  In addition, denial of participation in a program that could lead to a loss of good time credit is "speculative and 'fail[s] to allege interference with a protected liberty interest.'" *Shariff*, 2000 WL 1219381, at *6 n.7 (quoting *Brooks v. DiFasi*, 1997 WL 436750, at *3 (W.D.N.Y. July 30, 1997)).

Even if Plaintiff's allegations that documents were forged and falsified were taken as true, as the standard of review for a motion to dismiss directs, Lighthall could not survive a motion to dismiss on his Fourteenth Amendment cause of action.  Since there is no constitutional right to be conditionally released, Plaintiff must show that New York created a protected liberty interest in the terms of confinement and that the Defendants created an "atypical and significant hardship" as a result of the interest.  *Shariff*, 2000 WL 1219381, at *6.  Here, N.Y. CORRECT. LAW § 803(4) is clear that the state did not create a protected liberty interest.  Additionally, Plaintiff has failed to plead any atypical and significant hardship that was placed upon him with regard to his conditions of confinement.  "Merit Time" and good time credits are not guaranteed to any prisoner.  Therefore, Plaintiff has not stated a cause of action based on the Due Process Clause of the Fourteenth Amendment.[15]

---

accordance with the criteria herein specified. Such rules and regulations shall include provisions designating the person or committee in each correctional institution delegated to make discretionary determinations with respect to the allowances, the books and records to be kept, and a procedure for review of the institutional determinations by the commissioner.

[15] Defendants Lape, Schultz-Inman, Rowlands and Wright also allege that Plaintiff failed to commence an Article 78 proceeding regarding his Due Process claims.  Mot. to Dismiss, Mem. of Law at pp. 12 & 14.  However, as there were no Due Process violations, this issue is moot.  Nonetheless, the Prisoner Reform Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) states that administrative remedies must be exhausted when an inmate brings suit about prison life.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  According to the New York State Department of Corrections, a three-step process to exhaust all administrative remedies is available to inmates.  *See generally* N.Y. COMP. CODES R. & REGS. tit. 7, §§ 701.7 (a)(1), (3)-(5), (b), & (c).  Here, Plaintiff administratively exhausted his remedies.  Am. Compl. at ¶¶ 45-48, 62-63, & 66-68.

In addition to Lighthall's first claim under the Fourteenth Amendment, Plaintiff alleges that Dr. Vadlamudi violated the Due Process Clause when he acted with deliberate indifference to Plaintiff's medical needs.  Am. Compl. at ¶ 96.  Plaintiff's cause of action for deliberate medical indifference through the Fourteenth Amendment is misplaced.

"[I]ncarcerated prisoners are protected from cruel and unusual punishment in the form of inadequate medical care by the Eighth Amendment, as applied to the state by the Fourteenth Amendment."  *McKenna v. Wright*, 2002 WL 338375, at *9 (S.D.N.Y. Mar. 4, 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 101-05 (1976)).  A cause of action for deliberate indifference of medical care brought by a *pro se* prisoner under the Fourteenth and Eighth Amendments will only be construed as a claim pursuant to the Eighth Amendment.  *McKenna*, 2002 WL 338375, at *9.  Therefore Lighthall's cause of action under the Due Process Clause of the Fourteenth Amendment against Dr. Vadlamudi is construed as an Eighth Amendment claim, a claim that was disposed of above.  *See supra* Part II.D.

In addition to the Due Process claims, Plaintiff claims that Dr. Vadlamudi violated his Equal Protection rights under the Fourteenth Amendment "by increasing the punishment" of the crime for which he was incarcerated when Dr. Vadlamudi "fail[ed] to treat his medical condition."  Am. Compl. at ¶ 95.  Furthermore, Plaintiff alleges that Corrections Counselor Schultz-Inman, Superintendent Lape, and Senior ASA Counselor Rowlands violated his Equal Protection rights when they conspired to deny Lighthall any "consideration for discretionary release from prison" when documents were forged and false information was placed in his file. *Id.* at ¶ 104.  Plaintiff states that the Equal Protection Clause applies because he is in a suspect class as being physically disabled, was discriminated against by not being able to complete ASAT, and was further discriminated against when records were falsified.  *Id.* at ¶ 105.

29

The Equal Protection Clause of the Fourteenth Amendment states no "State [shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. It further "directs that all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citation omitted).

The Second Circuit has held that in order for a prisoner to state a violation of the Equal Protection Clause, the prisoner "must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (citation omitted). An Equal Protection claim may be brought "by a 'class of one' where a plaintiff alleges that []he has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 362-63 (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). However, the plaintiff need not specifically identify "actual instances where others have been treated differently" in order for the equal protection claim to be sufficient. *DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir. 2003).

As to Plaintiff's claim against Dr. Vadlamudi, it seems as if Lighthall disguises another Eighth Amendment claim under the Equal Protection Clause. Plaintiff fails to state a cause of action under the Equal Protection Clause since he fails to allege that he was treated differently than other inmates who were similarly situated. *See generally* Am. Compl. Additionally, as Plaintiff claims with a marvelously creative theory that Dr. Vadlamudi increased his punishment by failing to treat his medical conditions, nowhere does Plaintiff state that his sentence was increased by any amount of time. *See generally id.*

In regards to Corrections Counselor Schultz-Inman, Superintendent Lape, and Senior ASA Counselor Rowlands, construing that documents were falsified and forged, Plaintiff has

failed to plead a cause of action.  As noted above, Plaintiff does not claim that he was treated differently.  Even though he does not have to state the disparity with specific or particular instances, it still must be pled, which Plaintiff has failed to do.  Lighthall also has not shown that any dissimilar treatment was intentional or purposeful discrimination.  Since Lighthall failed to plead the inescapable crux of the Equal Protection claim, it is unnecessary to determine whether any rational basis existed for a possible disparity in treatment.

　　　For the reasons stated above, it is hereby recommended the Motion for Summary Judgment and the Motion to Dismiss be **granted** as to the causes of action alleging violations of the Fourteenth Amendment Due Process and Equal Protection Clauses.

### F.  Conspiracy Claims

Plaintiff asserts that Dr. Vadlamudi and Associate Commissioner Wright conspired by implementing policies and customs that "denied Plaintiff's grievances without investigating the facts" and the conspiracy also deprived Plaintiff of medical treatment.  Am. Compl. at ¶¶ 99 & 100.  Additionally, Plaintiff claims that Corrections Counselor Schultz-Inman and Senior ASA Counselor Rowlands conspired to deprive him of early release "by forging documents and relaying false information" to Superintendent Lape about Plaintiff's participation in ASAT.  *Id.* at ¶ 89.  Plaintiff also states that Superintendent Lape furthered the conspiracy by affirming the denial of Plaintiff's grievance and "acting in concert with Defendant's [sic] Schultz-Inman and Rowlands."  *Id.* at ¶ 90.

42 U.S.C. § 1985(3) states that if two or more people conspire to deprive a person of equal protection of the laws thereby injuring the person, then that party "may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of

the conspirators."[16]  To recover under this section, a plaintiff must be able to show 1) a

conspiracy; 2) meant to deprive a person or persons of equal protection of the laws or privileges

and immunities under the laws; 3) "an overt act in furtherance of the conspiracy; and 4) an injury

to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the

United States."  *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citations omitted).

     The conspiracy need not be shown by an "explicit agreement" between the parties, but

can be established through "the parties hav[ing] a tacit understanding to carry out the prohibited

conduct."  *Id.* (internal quotation marks and citations omitted).  If the allegations of a conspiracy

to deprive a person of his constitutional rights are "'conclusory, vague or general,'" then

dismissal is proper.  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (quoting *Leon v.

Murphy*, 988 F.2d 303, 311 (2d Cir. 1993)); *see also Webb v. Goord*, 340 F.3d 105, 111 (2d Cir.

2003).  However, the conspiracy does have to be "motivated by 'some racial or perhaps

otherwise class-based, invidious discriminatory animus behind the conspirators' action."

*Thomas*, 165 F.3d at 146 (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d

1085, 1088 (2d Cir. 1993)).

---

[16] In its entirety, 42 U.S.C. § 1985(3) states:

    Depriving persons of rights or privileges. If two or more persons in any State or Territory conspire, or
go in disguise on the highway or on the premises of another, for the purpose of depriving, either
directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal
privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted
authorities of any State or Territory from giving or securing to all persons within such State or
Territory the equal protection of the laws; or if two or more persons conspire to prevent by force,
intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or
advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an
elector for President or Vice-President, or as a member of Congress of the United States; or to injure
any citizen in person or property on account of such support or advocacy; in any case of conspiracy set
forth in this section, if one or more persons engaged therein do, or cause to be done, any act in
furtherance of the object of such conspiracy, whereby another is injured in his person or property, or
deprived of having and exercising any right or privilege of a citizen of the United States, the party so
injured or deprived may have an action for the recovery of damages, occasioned by such injury or
deprivation, against any one or more of the conspirators.

In this case, Plaintiff has failed to state a cause of action under § 1985.  First of all, Plaintiff's assertions regarding Superintendent Lape are general and as such warrant dismissal. Plaintiff merely states that Lape affirmed grievances that had been denied.  Am. Compl. at ¶ 90. Despite the general allegations as to Lape, Plaintiff has not pled that any of the conspiracies claimed to have occurred were motivated by some racial or class-based discriminatory animus. Even though no racial discrimination was alleged, as Plaintiff noted, "Marcy Correctional Facility is designated as a Medical Facility [] because it is set up on flat ground for medically disabled inmates, has housing units designated as wheelchair accessible and does not have stairs."  *Id.* at ¶ 27 n.3.  In spite of Plaintiff's residence in a facility for the medically disabled, Plaintiff has also failed to allege that he was discriminated against based on medical disabilities.

For the reasons stated above, it is hereby recommended that the Motion for Summary Judgment be **granted**, and the Motion to Dismiss be **granted** on the 42 U.S.C. § 1985 action.

### G.  The ADA and Rehabilitation Act

Plaintiff states that Dr. Vadlamudi and Superintendent Lape violated the ADA and § 504 of the Rehabilitation Act by discriminating against him based on his disability in making a determination of whether he could "participate in therapeutic programming."  Am. Compl. at ¶ 109.  In addition, Plaintiff claims that Dr. Vadlamudi and Superintendent Lape discriminated against Lighthall in their refusal of Plaintiff's request for "reasonable accommodations so that he would be able to participate and complete his recommended therapeutic programs[.]"  *Id.* at ¶ 110.

The Supreme Court has stated that Title II of the ADA applies to state prisons and inmates.  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-12 (1998) (cited in *Singleton*

33

*v. Perilli*, 2004 WL 74238, at *4 (S.D.N.Y. Jan. 16, 2004)).  Although suit may be brought

against a prison, the Second Circuit has held "neither Title II of the ADA nor § 504 of the

Rehabilitation Act provides for individual capacity suits against state officials."  *Garcia v. State*

*Univ. of New York Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).

      42 U.S.C. § 12202 states that "[a] State shall not be immune under the eleventh

amendment to the Constitution of the United States from an action in [a] Federal or State court of

competent jurisdiction for a violation of this [Act]."  The Supreme Court has affirmed that this

statute is "an unequivocal expression of Congress's intent to abrogate state sovereign immunity."

 *Unites States v. Georgia et al.*, 546 U.S. ____, 126 S. Ct. 877, 879 (2006).  Moreover, the

Supreme Court has held that Title II of the ADA creates a private cause of action for damages

for conduct that *actually* violates the Fourteenth Amendment as Title II validly abrogates the

sovereign immunity of the states.  *Unites States v. Georgia et al.*, 126 S. Ct. at 882; *see also*

*Tennessee v. Lane*, 541 U.S. 509, 518 & 520 (2004) (holding that "Congress can abrogate a

State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of

the Fourteenth Amendment to enforce the substantive guarantees of that Amendment" if

"'congruence and proportionality [exists] between the injury to be prevented or remedied and the

means adopted to that end.'" (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) & quoting

*City of Boerne v. Flores*, 521 U.S. 507, 520 (1997))).

      The Second Circuit has stated that "a private suit for money damages under Title II of the

ADA may only be maintained against a state if the plaintiff can establish that the Title II

violation was motivated by discriminatory animus or ill will due to the disability[.]"  *Garcia*, 280

F.3d at 111-12.  If a plaintiff were to sue individuals in their official capacities for money

damages, the Second Circuit has held that it would in fact be a suit against New York and

34

therefore the Eleventh Amendment would shield the individuals to the same extent as it would

shield New York.  *Garcia*, 280 F.3d at 107 (citing *Will v. Michigan Dep't of State Police*, 491

U.S. 58, 71 (1989) & *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).  As the Supreme

Court has abrogated sovereign immunity against the states under Title II, a plaintiff may bring a

lawsuit against individuals in their official capacities.  In addition to a lawsuit for money

damages, a plaintiff may pursue prospective injunctive relief against a person in his or her

official capacity.  *Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Cruz v. Gomez*, 202 F.3d at 595

n.2.

   In order to state a claim under 42 U.S.C. § 12132, Title II of the ADA, prisoners must

show:

> (1) they are "qualified individuals" with a disability; (2) that the defendants are
> subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate
> in or benefit from defendants' services, programs, or activities, or were otherwise
> discriminated against by defendants, by reason of plaintiffs' disabilities.

*Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citation omitted).

Additionally, to establish a cause of action under § 504 of the Rehabilitation Act, 29 U.S.C. §

794(a), the prisoner must show:

> (1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was
> "otherwise qualified" for the benefit that has been denied; (3) that he has been denied
> the benefits "solely by reason" of his disability; and (4) that the benefit is part of a
> "program or activity receiving Federal financial assistance."

*Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998) (quoting *Flight v. Gloeckler*, 68 F.3d 61, 63
(2d Cir. 1995)).

Since Title II of the ADA and § 504 of the Rehabilitation Act are so closely related, "unless one

of those subtle distinctions is pertinent to a particular case, [the Second Circuit will] treat claims

under the two statutes identically."  *Henrietta D.*, 331 F.3d at 272.

   A disability under the ADA is defined as "(A) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (B) a record of

such an impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(2)

(quoted in *Bragdon v. Abbott*, 524 U.S. 624, 630 (1998)). The consideration of subsection A

requires a three step process set forth by the Supreme Court. First, it must be determined if a

plaintiff's conditions constitute a physical impairment. *Bragdon*, 524 U.S. at 631. The Supreme

Court, looking to the Department of Health, Education and Welfare regulations to interpret the

Rehabilitation Act, defines a physical or mental impairment as:

> (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical
> loss affecting one or more of the following bodily systems: neurological;
> musculoskeletal; special sense organs; respiratory, including speech organs;
> cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin;
> and endocrine; or (B) any mental or psychological disorder, such as mental
> retardation, organic brain syndrome, emotional or mental illness, and specific
> learning disabilities.

45 C.F.R. § 84.3(j)(2)(i) (1997) (quoted in *Bragdon v. Abbott*, 524 U.S. at 632).

Second, upon determining whether a physical or mental impairment exists, an identification must

be made as to the "life activity upon which [plaintiff] relies . . . and determine whether it

constitutes a major life activity under the ADA." *Id.* at 631. Major life activities include

"'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working.'" 45 C.F.R. § 84.3(j)(2)(ii) (1997) & 28 C.F.R. §

41.31(b)(2) (1997) (quoted in *Bragdon v. Abbott*, 524 U.S. at 638-39) (noting that the list is not

exhaustive and that reproduction, the claimed activity, was a major life activity). The final step

is to ascertain whether "the impairment substantially limited the major life activity." *Id.* at 631.

Here, Plaintiff has alleged that there was discrimination based on his disability. Am.

Compl. at ¶ 109. Therefore, Plaintiff may proceed with a suit for money damages against Dr.

Vadlamudi and Superintendent Lape in their official capacities as well as for prospective relief in

both their individual and official capacities.

Plaintiff must state a cause of action under Title II of the ADA and § 504 of the Rehabilitation Act.  First, it must be determined if Lighthall is a "qualified individual" within the meaning of Title II.  Although Lighthall does not state with any specificity which of his conditions constitute physical impairments, it could be concluded that his heart troubles along with testicular and back problems fall within the definition of physical impairments which include cardiovascular, genito-urinary, and musculoskeletal conditions.  The second step concerning the major life activity becomes difficult to address since Plaintiff again fails to identify a major life activity upon which he relies.  However, reviewing his Amended Complaint, Lighthall alleges that he has trouble speaking, walking, using the bathroom, and needs assistance in caring for himself.  *See* Am. Compl. at ¶¶ 17, 18, 19, 23, & 31.  These would constitute major life activities.  The last step, which Plaintiff also fails to address, is to determine whether the physical impairments substantially limit the major life activities asserted.  It would be a logical conclusion that Plaintiff's physical impairments have substantially limited the life activities described in the Amended Complaint.  Therefore, Plaintiff would be a "qualified individual."

Nevertheless, Plaintiff's claim for reasonable accommodations must fail.  Pursuant to Title II of the ADA, "a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(7).  Therefore, the prison need only make reasonable modifications to policies to avoid discrimination on the basis of disability.  However, since there is a lack of evidence to show discrimination, the prison would not be required to make the modifications.

Even though the prison would not have to make reasonable modifications, Plaintiff received reasonable accommodations.  It must be noted, however, that Dr. Vadlamudi does not have the authority to approve or disapprove requests for reasonable accommodations and that he merely provides medical advice.  Dr. Vadlamudi Aff. at ¶ 100.  ASAT requires a participant to sit for an hour and a half "followed by a break," then another forty minute class is held.  *Id.* at ¶ 105.  In Plaintiff's September 14, 2004 request for reasonable accommodations to attend ASAT, he stated that he was "limited in his ability" to walk, stand, or sit for a long  period of time and that he was requesting "that [he] not be held to the same physical standards and expectations as a person . . . that had no medical problems or disabilities."  Am. Compl., Ex. E.  The request was denied stating that Lighthall could "receive a medical excuse for a specific medical need if medically warranted."  *Id.*  Lighthall, on several occasions, did indeed request medical excuses so that he would not have to participate in ASAT.  Dr Vadlamudi Aff., Ex. A at pp. 34, 36, 37, 59, & 76.  Notwithstanding, conditions were placed so that Lighthall could participate in the program.  On August 18, 2004, Dr. Haidershah stated that Lighthall did not have to sit for more than two hours and that he could stand every ten to fifteen minutes.  Dr. Vadlamudi Aff. at ¶ 106, Ex. A at p. 24.  Then, on August 30, 2004, Dr. Haidershah modified the conditions so that Lighthall could attend ASAT for up to three hours, while allowing Plaintiff to stand every ten to fifteen minutes.  Pl.'s Stat. of Material Facts at ¶¶ 70 & 71; Dr. Vadlamudi Aff. at ¶ 107, Ex. A at p. 23.  Plaintiff contests the discretion other officials would have on when and how he could stand.  Pl.'s Stat. of Material Facts at ¶ 72.  Despite Plaintiff's claim of discrimination, it would, in fact, seem as though Plaintiff's requests were granted.  Contrary to his Amended Complaint, Plaintiff is receiving benefits that the normal inmate would not solely because of Plaintiff's disabilities and medical conditions.

38

Plaintiff has not made a showing that any potential violation was motivated by discriminatory animus or ill will due to his disability apart from his general allegations.  As a result, Plaintiff is not entitled to money damages or prospective relief as no Title II nor § 504 violation has occurred.

Therefore, it is recommended that the Motion for Summary Judgment and the Motion to Dismiss be **granted** on this issue.

### H.  Preliminary Injunction

Plaintiff seeks a preliminary injunction to obtain medical treatment for sleep apnea, his vitamin B-12 deficiency, his heart condition, and physical therapy for his stroke.  Prelim. Inj. Mot., Mem. of Law at pp. 9-11.  As a component to this relief, Lighthall also requests reasonable accommodations to attend ASAT.  *Id.* at p. 11.  Additionally, Plaintiff seeks a preliminary injunction to enjoin the Defendants from "withholding good time credits and parole eligibility" because of Plaintiff's failure to complete ASAT.  *Id.* at p. 16.

Plaintiff's first ground for a preliminary injunction arises out of a deliberate indifference claim under the Eighth Amendment and a claim under the ADA for reasonable accommodations.  Plaintiff's second ground for a preliminary injunction arises from the Due Process Clause of the Fourteenth Amendment.  As stated above, by virtue of his claims being dismissed, the preliminary injunction motion is now moot.  *See supra* Parts II.D, II.E, & II.G.

For the reasons stated above, it is hereby recommended that the Motion for a Preliminary Injunction be **denied**.

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Motion for a Preliminary Injunction (Dkt. 11) be **DENIED**;

and it is further

RECOMMENDED, that the Cross-Motion for Summary Judgment (Dkt. No. 27) be

GRANTED; and it is further

RECOMMENDED, that the Motion to Dismiss (Dkt. No. 42) be GRANTED; and it is

further

RECOMMENDED, that since all the claims have been disposed of by the above

Recommendations, it is further recommended that the Amended Complaint be DISMISSED in

its entirety (Dkt. No. 10); and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation

and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28

U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   February 6, 2006
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge

41